**Entered on Docket
September 30, 2005
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA**

**Signed: September 28, 2005**

_____
**LESLIE TCHAIKOVSKY
U.S. Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re                                    No. 02-46284 T to
                                            02-46282 T
WESTERN ASBESTOS COMPANY,                Chapter 11
et al.,

        Debtors.
_____/
STEPHEN SNYDER, et al.,                  A.P. No. 04-4372 AT

        Plaintiffs,

    vs.

THE BANK OF NEW YORK
COMPANY, INC., et al.,

        Defendants.
_____/

**MEMORANDUM OF DECISION**

In the above-captioned adversary proceeding, Plaintiffs Stephen Snyder, Sandra Hernandez, and John Luikart, trustees of the Western Asbestos Settlement Trust ("Plaintiffs"), seek partial summary judgment on the sixth claim for relief in the First Amended Complaint (the "Complaint"). For the reasons stated below, the motion is denied.

## SUMMARY OF FACTS

The above-captioned chapter 11 cases were filed in November 2002. The Debtors were former distributors of asbestos-containing products. As such, for many years, they had been sued by individuals claiming illness as the result of exposure to those products. The filing of the chapter 11 cases was prompted by the Debtors' settlement of coverage litigation with USF&G, an insurance company. The settlement was negotiated with the participation of counsel for certain asbestos claimants ("Claimants' Counsel") and an unofficial futures representative (the "Futures Representative"). It contemplated the confirmation of a chapter 11 plan (the "Plan") and issuance of an injunction pursuant to 11 U.S.C. § 524(g) protecting USF&G from any further liability. The bulk of the settlement payment of nearly a billion dollars was to be paid into a trust (the "Trust") to be established upon confirmation of the Plan.

A settlement agreement (the "Settlement Agreement") was executed by the Debtors, USF&G, and the Claimants' Counsel in June 2002, approximately five months before the chapter 11 case was filed. Section 3.1 of the Settlement Agreement provides that USF&G will pay a total of $975 million, plus interest, into an escrow or trust to be established pursuant to 11 U.S.C. § 524(g). It was agreed that USF&G's liability would not exceed this amount except with respect to reimbursable fees and costs as forth in Section 3.2(a) of the Settlement Agreement.

Section 3.2(a) of the Settlement Agreement provides, in pertinent part, as follows:

> (a) In addition to the payments in Section 3.1, the USF&G Parties *shall advance, in the ordinary course as billed*:
>
> (i) *All Debtors' fees and costs* from and including May 17, 2002, *as incurred*, in connection with the handling and defense of asbestos-personal injury claims brought against any of the Debtors, *in connection with the bankruptcy proceedings and efforts to seek Plan Approval and the negotiation of this Agreement and transactions contemplated by it, including work in connection with* preparing the bankruptcy filing documentation and the bankruptcy cases and *any escrows described herein or escrows or trusts created in connection with the bankruptcy cases (except for the 524(g) Trust after Plan Approval)* [emphasis added].

Section 3.2(c) provides, in pertinent part:

> (c) *All amounts advanced...under Section 3.2(a)(i) through (iii)...shall be reimbursed to the USF&G Parties by the 524(g) Trust, with interest at the 30-day T bill rate accrued from the date of payment by the USF&G Parties, within fifteen (15) days following the 524(g) Trust's recovery from any of the Other Insurers*[1] of any amounts, whether by judgment, settlement or otherwise, *but in no event shall such fees exceed the amounts recovered by the Trust* [emphasis added].

In order to effectuate the Settlement Agreement, in June 2002, the Debtors, USF&G, and the Claimants' Counsel entered into two

---

[1] The phrase "Other Insurers" is defined as General Accident Insurance Company of America, The Hartford Accident and Indemnity Company and their related entities, The Home Insurance Company, individually and as successor in interest to The Home Indemnity Company, Argonaut Insurance Company, Continental Casualty Company and related entities, among others.

3

escrow agreements (the "Escrow Agreements") with the BNY Western Trust Company (the "Bank"), one in June 2002, about the time the Settlement Agreement was executed, and the other in mid-January 2003, shortly after the chapter 11 cases were filed. The Escrow Agreements were identical in form. On the first page, they recite that the Debtors, USF&G, and the Claimants' Counsel (referred to therein collectively as the "Parties") have entered into a Settlement Agreement to resolve insurance coverage litigation, that the Debtors have agreed to petition for chapter 11 reorganization so as to create a trust for payment of asbestos claims, and that the Settlement Agreement provides that the settlement funds will be placed in various escrow accounts pending their distribution in accordance with the Settlement Agreement. They provide that the purpose of the Escrow Agreements is to arrange for the escrow accounts and to appoint the Bank as the escrow agent.

Section 1 of the Escrow Agreements states that the Escrow Agreements are being executed and delivered pursuant to Section 3 of the Settlement Agreement, that their provisions should not be construed to enlarge or diminish the rights of the parties under the Settlement Agreement, and that capitalized terms used in the Escrow Agreements and not otherwise defined therein would have the meanings given them in the Settlement Agreement.

Section 2 of the Escrow Agreements is entitled "Appointment and Compensation of Escrow Agent." It provides as follows:

> The Escrow Agent is hereby appointed by the Parties to act as the escrow agent to administer the Escrow Accounts (as defined below) in accordance with the terms hereof, and the Escrow Agent hereby accepts such appointment. The Escrow Agent shall have all the rights, powers, duties and obligations provided herein. *The USF&G Parties shall be responsible for payment of the Escrow Agent's fees, as determined in accordance with the fee letter attached hereto as Exhibit A, and for reimbursement of the reasonable costs and expenses suffered or incurred by the Escrow Agent in connection with the performance of its duties and obligations hereunder. The Parties agree and acknowledge that such fees and costs will be paid by the USF&G pursuant to Section 3.2(a)(i) of the Settlement Agreement* [emphasis added].

The fee letter (the "Fee Schedule") attached as Exhibit A was drafted by the Bank. It provides for various fees, including Investment Charges. Although the heading refers to an Investment Charge of $35 on a per transaction basis, below the heading the following language is set forth:

> An investment charge of (35 Basis Points) will be assessed on the average monthly balance by the Trustee for government money market (sweep) investments in lieu of the $35.00 investment charge on a per transaction basis. The Trustee may also receive a service fee from the money market fund for administrative services that would otherwise be performed by the fund administrator.

Section 3 of the Escrow Agreements gives the Bank instructions concerning the establishment of the Escrow Accounts, the deposit of the funds being contributed by USF&G, and the Bank's duty to invest them. Section 4 gives the Bank instructions concerning how funds from the Escrow Accounts may be disbursed. Before funds can be disbursed, it states, the Bank must receive a written request

5

from the designated party or parties or a final court order of a court of competent jurisdiction.

Section 7 is entitled "Limitations on Liability of the Escrow Agent. Section 7(a) provides, in pertinent part, that: "[t]he Escrow Agent shall not be liable for any action taken or omitted by it in connection with the performance of its duties and obligations hereunder, except for its own gross negligence or willful misconduct." Section 7(f) provides that "[t]he Escrow Agent shall be responsible only for the performance of its duties as specified in...[the] Escrow Agreement." Section 9(b) requires the Escrow Agent to keep accurate and detailed records of all investments, receipts, and disbursements and to deliver to the Parties, within 10 days following the close of the month, a written account of its administration of the Escrow Accounts during the preceding month. Section 19 of the Escrow Agreements, entitled "Integration" provides that:

> This Escrow Agreement and the Settlement Agreement constitute the entire agreement and understanding of the Parties and the Escrow Agent with respect to the subject matter of this Escrow Agreement and supersede all prior agreements and understandings with respect thereto.

The Bank contends that it was not provided with a copy of the Settlement Agreement when the Escrow Agreements were executed and did not see a copy until the disputes concerning the Investment Charges arose.[2] The settlement funds were deposited and

---

[2] The Complaint alleges otherwise.

Case: 04-04372    Doc# 37    Filed: 09/28/05    Entered: 09/30/05 10:26:48    Page 6 of 20

invested as required by the Escrow Agreements in the Wells Fargo's Treasury Plus Institutional Money Market Fund (the "Wells Fargo Fund"). The Bank immediately began "assessing" monthly Investment Charges in accordance with the Fee Schedule. However, rather than sending a bill to USF&G for the charges so that USF&G could pay them, the Bank withdrew the amounts in question from the Escrow Accounts. The withdrawals were reflected on the statements of account activity issued during the following month as "Wells Fargo Trsry M Market #... Investment Sweep Fee Collected." Copies of these statements were sent to USF&G, the Debtors, and the Claimants' Counsel. The withdrawals amounted to approximately $200,000 per month.

None of the parties who received the statements contacted the Bank to complain about the withdrawals until after the Plan was confirmed in January 2004. By that time, the Bank had withdrawn over $4 million in Investment Charges from the Escrow Accounts. In or about March of 2004, counsel for the Futures Representative took note of the withdrawals and challenged them as unreasonable in amount. No complaint was made at that time about the fact that funds were withdrawn from the Escrow Accounts to pay the Investment Charges rather than USF&G being billed for them. However, during the course of the litigation, Plaintiffs, the trustees of the Trust, raised this issue, asserting that the withdrawals constituted a breach of contract.

After some months of negotiation, the Bank paid into the Escrow Accounts an amount equal to the funds withdrawn plus an amount that it calculated those funds would have "earned" if left in the Escrow Accounts. The "earnings" amounted to an approximate amount of $21,000.

The Plaintiffs contend that the withdrawals constituted a breach of contract and that, as a result, they are entitled to pre-judgment interest on the amounts withdrawn, not simply "earnings." The difference between these two amounts is approximately $700,000.

**DISCUSSION**

The Complaint asserts eight causes of action. The Plaintiffs seek partial summary judgment on the Sixth Cause of Action: i.e., for Breach of Fiduciary Duty - Escrow Agent's Failure to Follow Escrow Instructions. It is essentially a claim for breach of the Escrow Agreements. It alleges that the Escrow Agreements required the Bank to bill USF&G for the Investment Charges and that the Bank breached the Escrow Agreements by instead withdrawing funds from the Escrow Accounts to pay the Investment Charges.

The Sixth Cause of Action seeks damages in excess of $4 million. However, at present, because the Bank had repaid the principal of the withdrawals plus the "earnings," it is undisputed that the Plaintiffs seek damages on this claim only in the amount representing the difference between pre-judgment interest at the legal rate on the amounts withdrawn until they were repaid and the amount calculated by the Bank as the "earnings." The amount of the difference is calculated to be $701,875.96.

The Bank asserts six arguments in opposition to the Plaintiffs' motion. First, the Bank contends it was not a party to the Escrow Agreements. Second, it asserts that the Settlement Agreement was not part of the Escrow Agreement. Third, it argues

that the Escrow Agreements did not prohibit the Bank from withdrawing the Investment Charges from the Escrow Accounts. Fourth, the Bank contends that it is protected from liability for the breach Section 7 of the Escrow Agreements. Fifth, it asserts that the claim has been waived and, sixth, that the Trust should be estopped from asserting the claim. The Court addresses each of these arguments below.[3]

**1. Was the Bank a Party to the Escrow Agreements?**

The Bank contends that it may not be held liable for breach of the Escrow Agreements because it was not a party to these agreements.[4] It bases this contention on the fact that the preamble to the agreement identifies USF&G, the Debtors, and the Claimants' Counsel as the Parties and does not include the Bank within that definition. This argument has no merit. The preamble to the Escrow Agreements states, in pertinent part, that: "This ESCROW AGREEMENT is made...by and among...collectively...the "Parties" and BNY Western Trust Company": i.e., the Bank. Moreover, the Bank signed the Escrow Agreements. Regardless of whether the Escrow Agreements referred to the Bank as a party, the Bank is clearly bound by the terms of those agreements.

---

[3]According to the Plaintiffs' reply brief, the Bank has challenged its standing to assert these claims. The Bank did not include this argument in its opposition brief. Therefore, the Court will not discuss it.

[4]This argument was not included in the Bank's opposition brief. However, it was advanced in oral argument at the hearing on the Plaintiffs' motion. Therefore, the Court will address it.

9

**2. Was the Settlement Agreement Incorporated into the Escrow Agreements?**

The Bank's next argument is that, even if it was a party to the Escrow Agreements, it was not a party to the Settlement Agreement and thus is not bound by its terms. The Bank notes that it did not sign the Settlement Agreement and that the Settlement Agreement was executed before it was approached to act as escrow agent. As noted above, the Bank claims that it did not even see a copy of the Settlement Agreement until after the dispute arose concerning the amount of the Investment Charges.[5]

This argument also has no merit. Clearly, the Bank was not bound by any of the terms of the Settlement Agreement before it executed the Escrow Agreements. However, by signing the Escrow Agreements, the Bank agreed to be bound by any provisions in the Settlement Agreement relevant to its obligations under the Escrow Agreements. Section 19 of the Escrow Agreements expressly incorporated the Settlement Agreement into the Escrow Agreement.

Moreover, the Escrow Agreements contain numerous references to the Settlement Agreement. Assuming the Bank read the Escrow Agreements, it could not reasonably have concluded that its duties were not prescribed, at least in part, by the terms of the Settlement Agreement. As noted above, the recitals in the Escrow

---

[5] Declarations are provided in support of this factual contention. The Complaint alleges otherwise. However, no evidence has been provided by the Plaintiffs that a copy of the Settlement Agreement was provided to the Bank at any time before the dispute arose.

10

Agreement make it clear that the purpose of the Escrow Agreements is to facilitate the performance of the Settlement Agreement. Section 1 of the Escrow Agreements states that the Escrow Agreements are being executed and delivered pursuant to Section 3 of the Settlement Agreement and that capitalized terms used in the Escrow Agreements and not otherwise defined therein have the meanings given them in the Settlement Agreement. Most important, Section 2 of the Escrow Agreements provides that the Escrow Agent's fees and costs will be paid by USF&G pursuant to Section 3.2(a)(i) of the Settlement Agreement.

**3. Do the Escrow Agreements Permit the Bank To Deduct the Investment Charges Fees from the Funds in the Escrow Accounts?**

The heart of the Bank's opposition is that the Escrow Agreements do not require the Bank to bill USF&G for the Investment Charges. Thus, according to the Bank, it did not breach the Escrow Agreements for them to do so. The Bank notes that the Escrow Agreements merely state that USF&G will be "responsible" for the Bank's fees. It does not state how the Investment Charges would be paid. The Bank notes that the Fee Schedule attached to the Escrow Agreements stated that the Investment Charges would be "assessed." It contends that the word "assessed" could reasonably be interpreted to permit the Investment Charges to be withdrawn by the Bank from the funds in the Escrow Accounts. In support of this contention, they provide a copy of a dictionary definition of the word "assess" which

11

includes the definition "to determine the amount of and impose...according to an established rate or apportionment...."

The Court is not persuaded by this argument. At best, the meaning of the word "assess" is ambiguous. It is not clear that the dictionary definition quoted by the Bank means by the word "impose" cause to be paid. The Bank drafted this language. Thus, any ambiguity must be construed against its interest. More important, the meaning of "assess" advanced by the Bank is inconsistent with the remaining language of the sentence. The sentence states that the Investment Charges will be "assessed on an average monthly balance[.]" An average monthly balance is not a pot of money from which the Investment Charges may be withdrawn. It is an abstract concept permitting the determination of the amount of the Investment Charges. A common meaning of "assess" is to determine the amount. That is the only reasonable construction of the word in this context.

The Bank concedes that Section 2 of the Escrow Agreements provides that the Escrow Agent's fees will be paid by USF&G pursuant to Section 3.2(a)(i) of the Settlement Agreement and that Section 3.2 states that USF&G "shall advance, in the ordinary course as billed" certain of the Debtors' fees and costs. However, it contends that the fees and costs described in Section 3.2(a)(i) do not include the Investment Charges. As noted above, Section 3.2(a)(i) describes those fees and costs as:

> All Debtors' fees and costs from and including
> May 17, 2002, as incurred, in connection with
> the handling and defense of asbestos-personal

12

> injury claims brought against any of the Debtors, in connection with the bankruptcy proceedings and efforts to seek Plan Approval and the negotiation of this Agreement and transactions contemplated by it, including work in connection with preparing the bankruptcy filing documentation and the bankruptcy cases and any escrows described herein or escrows or trusts created in connection with the bankruptcy cases (except for the 524(g) Trust after Plan Approval).

The Bank reads the relevant portion of this provision as the "Debtors' fees and costs...in connection with preparing...any escrows described herein...." The Investment Charges were not for preparing the escrows. Thus, according to the Bank, they were not governed by Section 3.2(a)(i).

However, the relevant portion of Section 3.2(a)(i) can also be read as the "Debtors' fees and costs...in connection with...any escrows described herein...." The Court concludes that the latter reading is the only one that makes sense in the context of the Settlement Agreement as a whole. The Settlement Agreement makes it clear that USF&G agreed to bear the cost of the chapter 11 cases and any related transactions, including the ongoing expenses of the Escrow Accounts, pending confirmation of a plan. USF&G agreed that it would only be entitled to be reimbursed for these advances if the Debtors (or the Trust) were successful in recovering any additional amounts from other insurers. No such recoveries were obtained until after the Plan was confirmed in early 2004. The Investment Charges began accruing and the Bank began deducting them in or before September 2003. Thus, for over a year while the Bank was deducting the Investment Charges, USF&G

13

was the only party responsible for them and was not entitled to be reimbursed.

Moreover, even if Section 3.2(a)(i) is read in the manner argued for by the Bank, the Court would still conclude that the Bank's withdrawal of the Investment Charges breached the Escrow Agreements. Section 2 of the Escrow Agreements stated that the Escrow Agent's fees would be paid as set forth in Section 3.2(a)(i). The Fee Schedule described the components of the Escrow Agent's fees which included the Investment Charges. Section 3.2(a)(i) of the Settlement Agreement dictated how those fees would be paid.

**4. Is the Bank Protected From Liability By Section 7 of the Escrow Agreements?**

As set forth above, Section 7 of the Escrow Agreements limited the Bank's liability to acts or omissions committed through gross negligence or willful misconduct. Based on this provision, in its opposition brief, the Bank contended that, even if did breach the Escrow Agreements, it may not be held liable for any damages. The Plaintiffs did not respond to this argument in their reply brief. The Bank did not make this argument at the hearing on the motion. Nevertheless, the Court will address it.

This argument appears to assume that the Sixth Cause of Action asserts a tort claim. In fact, as the Plaintiffs note and the allegations of the Complaint make clear, it asserts a breach of contract claim. As noted above, Section 7(f) of the Escrow Agreement provides that "[t]he Escrow Agent shall be responsible

14

only for the performance of its duties as specified in...[the] Escrow Agreement." Thus, Section 7's limitation of the Bank's liability does not protect the Bank from liability for a breach of contract claim.

**5. Has the Claim Been Waived?**

The Bank contends that the breach of contract claim has been waived. It acknowledges that waiver requires the "voluntary relinquishment, expressly or impliedly, of a known right." See Morgan v. Int'l Aviation Underwriters, Inc., 240 Cal. App. 2d 176, 180 (1967). It concedes that neither the other parties to Escrow Agreements nor the Plaintiffs have expressly waived their right to require the Bank to bill USF&G for the Investment Charges rather than deducting them from the Escrow Accounts. Rather, it contends that they have impliedly waiver this right by continuing to accept the Bank's performance notwithstanding their receipt of the monthly statements disclosing the Bank's withdrawal of the Investment Charges from the Escrow Accounts. The Bank contends that, if the Court is unable to conclude that there has been an implied waiver based on the undisputed facts presented here, at a minimum, the issue presents a material factual dispute so that summary judgment should be denied on the Sixth Cause of Action.

The Court concludes that the evidence presented is insufficient to establish a waiver on the part of the Bank as a matter of law. There is no evidence that any of the parties to the Escrow Agreement (other than the Bank) of the Plaintiffs knew that the Bank was withdrawing the Investment Charges from the

15

Escrow Accounts. The only evidence is that they received monthly statements containing a reference to the withdrawals, among other things, that did not even include the term "Investment Charge."[6]

Because the Escrow Agreements required the Bank to bill USF&G, there was no reason for USF&G to scrutinize the monthly statements to determine whether any inappropriate withdrawals had been made. Until recoveries were obtained by the bankruptcy estate from other insurers, there was no reason for the other parties to anticipate any request for reimbursement from USF&G. Given the strict limitations on the circumstances under which the Bank could make any disbursements from the Escrow Accounts, there was no reason for the other parties to the Escrow Agreements to anticipate any dissipation of the funds in the Escrow Accounts.

If the Bank were able to establish through discovery that the other parties to the litigation actually knew about the Bank's withdrawals of the Investment Charges during the preceding year, the Court might conclude that there had been an implied waiver. Otherwise, it would find in favor of the Plaintiffs on this issue. However, it appears to be undisputed that the Plaintiffs did not assert the Sixth Cause of Action until somewhat later in the litigation. Therefore, the Bank may not have had an adequate opportunity to conduct discovery on this issue. For this reason,

---

[6] The references in the statements themselves did not telegraph their nature: i.e., "Wells Fargo Trsry M Market #... Investment Sweep Fee Collected."

16

the Court will not summarily adjudicate the availability of this defense.

### 6. Are the Plaintiffs Estopped From Asserting the Breach of Contract Claim?

The Bank's final argument is that the Plaintiffs, as the successors to the other parties to the Escrow Agreements, are estopped from asserting the Sixth Cause of Action. The Bank notes that, to establish an estoppel defense, ordinarily, four things must be established: (1) the party to be estopped knew the facts; (2) the party to be estopped intended that its conduct be acted upon (or acted in such a manner that the party asserting the estoppel reasonably believed that it did); (3) the party asserting the estoppel was ignorant of the true state of the facts; and (4) the party asserting the estoppel relied on the other party's conduct to its injury. See Lemat Corp. V. American Basketball Assn'n, 51 Cal. App. 3d 267, 275 (1975); Morgan v. Int'l Aviation Underwriters, Inc., 250 Cal. App. 2d 176, 180 (1967).

The Bank contends that a reasonable trier of fact could find that the other parties to the Escrow Agreements knew that: (1) the Bank was deducting the Investment Charges from the Escrow Accounts, (2) the Bank reasonably believed that their failure to object to the fact that the Investment Charges were being deducted meant that they had no objection to this procedure, (3) the Bank had no way to anticipate that the successor in interest to the other parties to the Escrow Agreements would construe the Escrow Agreements as prohibiting the deduction of the Investment Charges

17

from the Escrow Accounts, and (4) the Bank relied on the silence of the other parties to the Escrow Agreements by continuing to perform as Escrow Agent. Therefore, it contends, summary judgment on the Sixth Cause of Action is inappropriate.

The difficulty with this argument is the same as with the waiver defense. There is no evidence that the other parties to the Escrow Agreements knew that the Bank was deducting the Investment Charges from the Escrow Accounts. As the Court observed above, there is no evidence that the other parties to the Escrow Agreements actually knew that the Bank was deducting the Investment Charges from the Escrow Accounts. All the evidence establishes is that monthly statements were sent to the other parties with a line item containing no reference to Investment Charges. The Bank notes that California cases have not always required all elements of an estoppel to be established. See Lemat Corp. v. American Basketball Ass'n, 51 Cal. App. 3d. 267, 276 (1975).[7]

As with the waiver defense, based on the evidence presented to date, the Court is unable to find that the Plaintiffs are estopped from asserting the Sixth Cause of Action as a matter of law and, if no further evidence is presented, would find in favor

---

[7]In Lemat Corp., the American Basketball Association was held to be estopped from denying liability under an indemnity agreement reflected by a resolution which it believed had been validly adopted by its board but which had not received the required number of votes after the other party to the agreement had relied on the agreement to its detriment.

18

of the Plaintiffs. However, the Bank may need additional time to conduct discovery on this issue. Therefore, the Court will defer summarily adjudicating the issue at this time.

**CONCLUSION**

The Court will summarily adjudicate the following issues:

1. The Bank is a party to the Escrow Agreements.

2. The Settlement Agreement was incorporated into the Escrow Agreements and the Bank is therefore bound by its terms.

3. The Escrow Agreements required the Bank to bill USF&G for the Investment Charges and did not permit the Bank to withdraw the Investment Charges from the Escrow Accounts.

4. Section 7 of the Escrow Agreements does not protect the Bank from liability on the Sixth Cause of Action.

The Court will not summarily adjudicate at this time:

1. Whether the Plaintiffs (or their predecessors in interest) waived their right to assert that the Bank's withdrawal of the Investment Charges from the Escrow Accounts breached the Escrow Agreements.

2. Whether the Plaintiffs are estopped from asserting that the Bank's withdrawal of the Investment Charges from the Escrow Accounts breached the Escrow Agreements.

Counsel for the Plaintiffs is directed to submit a proposed form of order in accordance with this decision.

END OF DOCUMENT

COURT SERVICE LIST

Matthew J. Shier
Pinnacle Law Group LLP
425 California St., Ste. 1800
San Francisco, CA 94104

Jack R. Nelson
Reed Smith LLP
1999 Harrison St., Ste. 2400
Oakland, CA 94612-3572